JULIA HARUMI MASS, SBN 189649
MICHAEL T. RISHER, SBN 191627
WILLIAM S. FREEMAN, SBN 82002
NOVELLA Y. COLEMAN, SBN 281632
CHRISTINE P. SUN, SBN 218701
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA  94111
Telephone:    (415) 621-2493
Facsimile:    (415) 255-8437
Email: jmass@aclunc.org

Attorneys for Plaintiffs
Hadil Al-Mowafak, Wasim Ghaleb and John
Doe, on behalf of themselves and others
similarly situated; ACLU of Northern
California; Jewish Family & Community
Services East Bay

R. ADAM LAURIDSEN, SBN 243780
EDUARDO E. SANTACANA, SBN 281668
GRACE YANG, SBN 286635
IAN KANIG, SBN 295623
CHESSIE THACHER, SBN 296767
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA  94111
Telephone:    (415) 391-5400
Facsimile:    (415) 397-7188

Attorneys for Plaintiffs
Hadil Al-Mowafak, Wasim Ghaleb and John
Doe, on behalf of themselves and others
similarly situated; ACLU of Northern
California; Jewish Family & Community
Services East Bay

[SEE NEXT PAGE FOR ADDITIONAL COUNSEL]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Hadil Al-Mowafak, Wasim Ghaleb and John Doe, on behalf of themselves and others similarly situated; ACLU of Northern California; Jewish Family & Community Services East Bay,<br><br>Plaintiffs,<br><br>v.<br><br>Donald Trump, President of the United States; U.S. Department of State; U.S. Department of Homeland Security; U.S. Customs and Border Protection; Rex W. Tillerson, Secretary of State; John Kelly, Secretary of U.S. Department of Homeland Security; Kevin McAleenan, Acting Commissioner of U.S. Customs and Border Patrol; Carrie Azurin, Field Director, San Francisco Field Office of U.S. Customs and Border Patrol,<br><br>Defendants. | Civil Case No. _____<br><br><br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1    AHILAN T. ARULANANTHAM, SBN 237841
     AMERICAN CIVIL LIBERTIES UNION
2    FOUNDATION OF SOUTHERN CALIFORNIA
     1313 West 8th Street
3    Los Angeles, CA 90017
     Telephone:      (213) 977-5211
4    Facsimile:      (213) 977-5297
     Email: aarulanantham@aclu-sc.org
5
     BARDIS VAKILI, SBN 247783
6    DAVID LOY, SBN 229235
     ACLU FOUNDATION OF SAN DIEGO
7    AND IMPERIAL COUNTIES
     P.O. Box 87131
8    San Diego, CA 92138-7131
     Telephone:      (619) 232-2121
9    Facsimile:      (619) 232-0036
     Email: bvakili@aclusandiego.org
10
     ANDRE SEGURA, SBN 247681
11   OMAR C. JADWAT*
     AMERICAN CIVIL LIBERTIES UNION
12   FOUNDATION, IMMIGRANTS' RIGHTS
     PROJECT
13   125 Broad Street, 18th Floor
     New York, NY 10004
14   Telephone:      (212) 549-2618
     Facsimile:      (212) 549-2654
15   Email: asegura@aclu.org

16   CECILLIA D. WANG, SBN 187782
     JENNIFER CHANG NEWELL, SBN 233033
17   AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION, IMMIGRANTS' RIGHTS
18   PROJECT
     39 Drumm Street
19   San Francisco, CA 94111
     Telephone:      (415) 343-0770
20   Facsimile:      (212) 395-0950
     Email: cwang@aclu.org
21
     *Pro Hac Vice Forthcoming
22
23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR DEC. AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      On December 7, 2015, then-candidate Donald J. Trump issued a statement "calling for a total and complete shutdown of Muslims entering the United States."  Defendant Trump remained consistent on this position throughout his campaign for the presidency.

2.      Following his election as President, Defendant Trump implemented his plan to ban individuals on the basis of their religious beliefs: One week after he took office, on January 27, 2017, Defendant Trump issued an Executive Order (the "Executive Order") completely prohibiting for at least 90 days the entry or re-entry of all persons who are nationals of seven predominantly Muslim countries—Iran, Iraq, Libya, Somalia, Sudan, Syria and Yemen (the "Designated Countries")—regardless of whether such persons hold valid visas or are lawful permanent residents of the United States.  As one of Defendant Trump's senior advisors confirmed the next day, the Executive Order is an attempt to institute the promised "Muslim ban."

3.      Also on January 27, 2017, the Deputy Assistant Secretary for Visa Services at the Bureau of Consular Affairs of the Department of State, relying on the authority of the Executive Order, summarily and provisionally revoked all valid nonimmigrant and immigrant visas of nationals of the seven predominantly Muslim Countries, subject to exceptions not relevant here.  This revocation ("the Provisional Revocation Letter") threatens countless nationals of the Designated Countries who are currently in the United States or who reside in the United States but were traveling abroad when the letter was issued.

4.      The First Amendment does not allow the government to circumvent its protections for religious freedom so easily.  As the Supreme Court explained in striking down a law that targeted members of an unpopular religion, "[o]fficial action that targets religio[n] … cannot be shielded by

1144492.01

mere compliance with the requirement of facial neutrality.   The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."   *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).   The Executive Order and the Provisional Revocation Letter violate the First Amendment because they are thinly veiled attempts to discriminate against Muslims by barring them from entry to the United States.

5.     The Immigration and Nationality Act ("INA") ensures that the United States does not adopt certain discriminatory immigration policies.   The INA prohibits preference or discrimination on the basis of "a person's race, sex, nationality, place of birth or place of residence."   8 U.S.C. §1152(a)(1)(A).   The Executive Order and the Provisional Revocation Letter contradict this statute and instead would revoke visas and deny entry based on nothing but "nationality, place of birth or place of residence."

6.     Plaintiffs include nationals of the Designated Countries who are or have been lawfully present in California and who, but for the Executive Order and/or the Provisional Revocation Letter, have the lawful right to travel to and from the United States.   Plaintiffs also include organizations that wish to hear from and associate with people barred from entering the nation under the orders.   Plaintiffs bring this action on behalf of themselves and other persons similarly situated to challenge various provisions of the Executive Order and the Provisional Revocation Letter that violate the First Amendment, the equal-protection and due process rights granted under the Fifth Amendment, the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 *et seq.*, the Immigration and Nationality Act, 8 U.S.C. § 1101 *et. seq*, and the Administrative Procedure Act.

////

1144492.01

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction under 5 U. S. C. § 706 and 28 U.S.C. §§ 1331 and 1361, and has further remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

8.      Venue properly lies within the Northern District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in the District.

**INTRADISTRICT ASSIGNMENT**

9.      Pursuant to Civil L.R. 3-2(c), this case should be assigned to the San Francisco or Oakland Division of this Court because the action arises in San Francisco County.

**PARTIES**

10.     Plaintiff Hadil Al-Mowafak is a Yemeni national who is currently in her freshman year at Stanford University in Palo Alto, California.  She possesses a valid F-1 student visa and has continuously resided in the United States since September 17, 2016.  As described below, Plaintiff Al-Mowafak plans to travel to Yemen in the summer of 2017 to visit her husband, who lives in Yemen.  Because her husband does not have a United States visa, the only way that Plaintiff Al-Mowafak can see her husband is if she travels to Yemen to visit him.

11.     Plaintiff Wasim Ghaleb is a Yemeni national who is currently studying business administration at Grossmont College in San Diego, California.  Plaintiff Ghaleb possesses a valid F-1 student visa and continuously resided in California from March 4, 2016 to January 15, 2017.  As described below, Plaintiff Ghaleb travelled to Saudi Arabia on January 15 to visit his family,

CLASS ACTION COMPLAINT FOR DEC. AND INJUNCTIVE RELIEF

1144492.01

fully intending to return to California two weeks later for the spring semester.  Instead, he is now stuck outside the country because of the Executive Order.

12.     Plaintiff John Doe is an Iranian national who is currently a Ph.D. candidate at University of California, Berkeley.  He possesses a valid F-1 student visa and has continuously resided in the United States since September 2012.  As described below, Plaintiff Doe received and accepted a job offer at a top Fortune 50 Company in Silicon Valley.  He fears that his post-graduate work authorization will be affected by the Executive Order and result in the loss of this job opportunity.  He brings suit under a pseudonym because he fears retaliation.

13.     Plaintiff American Civil Liberties Union of Northern California ("ACLU-NC"), founded in 1934 and based in San Francisco, California, is one of the largest ACLU affiliates, with more than 95,000 members, thousands of whom live in this District.  Plaintiff ACLU-NC has long been dedicated to protecting the constitutional rights of its members and of all Californians, including their rights to religious liberty and equal protection of the laws.  Plaintiff ACLU-NC has members of many faiths— Muslim, Christian, Jewish and others— who are directly affected by the Executive Order and its implementation, including nationals of the Designated Countries who are now unable to travel. Other ACLU-NC members are U.S. citizens and permanent  residents who wish to hear the speech of and associate with people of all faiths who are now unable to travel or return to the United States because of the Executive Order.  In addition, Plaintiff ACLU-NC has members who pay federal taxes and are opposed to the use of their tax dollars to implement and enforce the unlawful actions that are the subject of this lawsuit.

14.     Plaintiff Jewish Family & Community Services East Bay ("JFCS-EB"), founded in 1877 as the Daughters of Israel Relief Society, has a long history of working to resettle and

provide legal and other services to refugees and immigrants from many countries, including people from the Designated Countries, in the San Francisco Bay Area, and serves and supports Alameda and Contra Costa County residents of all ages, races, and religions.  Plaintiff JFCS-EB supports those refugees and immigrants who are already present in the area, and stands ready to welcome and provide services to additional refugees and immigrants who are able to gain entry to the United States.  Defendants' actions impede JFCS-EB's ability to carry out its mission, as JFCS-EB has been forced to divert its limited resources from critical ongoing work in support of refugees and immigrants in order to assist individuals negatively impacted by the Executive Order, such as responding to new and acute inquiries and requests for assistance.

15.     Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

16.     Defendant U.S. Department of State is a cabinet department of the United States federal government that is responsible for issuing visas.

17.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet department of the United States federal government with the primary mission of securing the United States.

18.     Defendant U.S. Customs and Border Protection ("CBP") is an agency within DHS with the primary mission of detecting and preventing the unlawful entry of persons and goods into the United States.

19.     Defendant Rex W. Tillerson is the Secretary of State.  He is sued in his official capacity.

20.     Defendant John Kelly is the Secretary of DHS.  He is sued in his official capacity.

21.     Defendant Kevin K. McAleenan is the Acting Commissioner of CBP. He is sued in his official capacity.

22.     Defendant Carrie Azurin is the Field Director of the San Francisco Field Office of CBP.  She is sued in her official capacity.

## STATEMENT OF FACTS

### President Trump's January 27, 2017 Executive Order

23.     On January 27, 2017, Defendant Trump signed the Executive Order entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States." A copy of this Executive Order is attached to this Complaint as Exhibit A.

24.     The Executive Order, citing the threat of terrorism committed by foreign nationals, purports to direct a variety of changes to the manner and extent to which non-citizens may seek and obtain admission to the United States.  Among other things, the Executive Order imposes a 120-day moratorium on the resettlement of refugees; proclaims that "that the entry of nationals of Syria as refugees is detrimental to the interests of the United States," and therefore "suspend[s]" indefinitely their entry to the country; and drastically limits to 50,000 the number of refugees from all countries who may be admitted in fiscal year 2017 on the ground that admission of a greater number of refugees would be "detrimental to the interests of the United States."

25.     Under Section 3(c) of the Executive Order, Defendant Trump proclaims "that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States," and that he is therefore "suspend[ing] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order," with narrow

exceptions not relevant here.  This section of the Executive Order appears on its face to prevent all persons who are nationals of such countries from entering the United States, regardless of whether they are otherwise admissible.

26.    Under Section 1 of the Executive Order, entitled "Purpose," the Executive Order states that at the time of the September 11, 2001 terrorist attacks, "State Department policy prevented consular officers from properly scrutinizing the visa applications of several of the 19 foreign nationals" involved in those attacks.  However, the Executive Order does not impose any restrictions on nationals of the countries of which the September 11 attackers were citizens.

27.    The same day the Executive Order issued, the Deputy Assistant Secretary for Visa Services at the Bureau of Consular Affairs of the Department of State, relying on the Executive Order, issued a letter purporting to provisionally revoke all valid nonimmigrant and immigrant visas of nationals of the Designated Countries, subject to exceptions not relevant here.  The Provisional Revocation Letter was not publicized; to the contrary, it was withheld from the public until it was filed four days later under a "Notice of Supplemental Authority" in multiple cases challenging the Executive Order.  The existence of the Provisional Revocation Letter broadens the chaos caused by the Executive Order.  The federal government has apparently issued no public and legally binding guidance regarding the meaning or proper interpretation of the Provisional Revocation Letter. A copy of this letter is attached to this Complaint as Exhibit B.

28.    The Provisional Revocation Letter also appears to expand the scope of the Executive Order's application: it applies on its face to persons who are present inside the United States as well as persons outside the United States, rather than being limited to persons seeking to enter the United States.  Under section 221(a)(1)(B) of the INA, 8 U. S. C. § 1227(a)(i)(B), any alien whose

nonimmigrant visa has been revoked under 8 U. S. C. § 1201(i) (INA § 221(i), referenced in the Provisional Revocation Letter) is deportable.  Immigration attorneys report that the Provisional Revocation Letter is now being applied to immigrants lawfully residing within the United States who have pending applications for asylum, lawful permanent residence and other immigration benefits.

**The Text and History of the Executive Order Show Discriminatory Intent**

29.    The Executive Order and the Provisional Revocation Letter currently apply to nationals of seven countries, all of which are majority Muslim countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.  The Executive Order, by its express terms, suspends immigrant and nonimmigrant entry into the United States based on nationality, place of birth or place of residence.  The Provisional Revocation Letter similarly revokes "all valid nonimmigrant and immigrant visas of nationals" based on nationality, place of birth, or place of residence.

30.    The Executive Order is an attempt by Defendant Trump to fulfill a campaign promise to ban Muslims from entering the United States.  In a December 7, 2015 written statement, "Donald J. Trump Statement on Preventing Muslim Immigration," then-candidate Trump said that he was "calling for a total and complete shutdown of Muslims entering the United States."  This statement is still displayed on the official Trump-Pence website.[1]

31.    That same day, Defendant Trump sent a tweet that stated "DONALD J. TRUMP STATEMENT ON PREVENTING MUSLIM IMMIGRATION," linking to the statement.[2]  He also read a slightly modified version of the statement himself in public, declaring that "Donald J.

---

[1] https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration [last accessed on February 1, 2017].
[2] https://twitter.com/realDonaldTrump/status/673993417429524480 [last accessed on February 1, 2017].

CLASS ACTION COMPLAINT FOR DEC. AND INJUNCTIVE RELIEF

1144492.01

Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what the hell is going on.  We have no choice."[3]

32.     On December 13, 2015, during an interview on CNN, Defendant Trump reaffirmed his intent to institute a ban on Muslims entering the country. When asked about his "call … for, 'a total and complete shutdown of Muslims entering the U.S.'" he nodded his head and defended his position. Later, when he was asked whether he thought the ban would be was constitutional, he replied, "first of all, they're not citizens."[4]

33.     Defendant Trump repeatedly referred to a ban on Muslim immigration on the campaign trail.  For example, in a speech on June 13, 2016, Defendant Trump stated, "I called for a ban after San Bernardino and was met with great scorn and anger.  But now many … are saying that I was right to do so."[5]

34.     In July 24, 2016 interview on Meet the Press, Defendant Trump was asked directly if a plan similar to the now-enacted Executive Order was a "rollback" from "[t]he Muslim Ban." Defendant Trump rejected the suggestion:  "I don't think so.  I actually don't think it's a rollback. In fact, you could say it is an expansion."[6]

35.     After the election, on December 22, 2016, a reporter asked Defendant Trump whether his "plans to create a Muslim register or ban Muslim immigration to the United States"

[3] http://wpo.st/O0uY2 [last accessed on February 1, 2017].
[4] A video of this interview is available on CNN's Youtube Channel at https://www.youtube.com/watch?v=JKtcdn0zAqw; the referenced comments occur during the first 15 seconds of the interview and at 8:45 [last accessed on February 1, 2017].
[5] http://www.vox.com/2016/6/13/11925122/trump-orlando-foreign-policy-transcript [last accessed on February 1, 2017].
[6] http://www.nbcnews.com/meet-the-press/meet-press-july-24-2016-n615706 [last accessed on February 1, 2017].

CLASS ACTION COMPLAINT FOR DEC. AND INJUNCTIVE RELIEF

1144492.01

had changed.  Defendant Trump responded "you've known my plans all along" and that he was "100% correct" in his position.[7]

36.     In the days after the Executive Order, Defendant Trump referred to the Executive Order as a "ban."  On January 30, Defendant Trump tweeted: "If the ban were announced with a one week notice, the 'bad' would rush into our country during that week."[8]  On February 1, Defendant Trump expressed his indifference to whether the Executive Order is characterized as a ban on Muslims: "Everyone is arguing whether or not it is a BAN.  Call it what you want…."[9]

37.     Senior advisors to Defendant Trump have engaged in anti-Muslim rhetoric that provide additional support for the notion that the Executive Order was prompted by animus toward Islam and Muslims.

38.     In the summer of 2014, Stephen Bannon, chief strategist and senior counselor to Defendant Trump and a reported principal architect of the Executive Order, advocated for separation from those of the Muslim faith, telling a meeting of the Human Dignity Institute:  "If you look back at the long history of the Judeo-Christian West struggle against Islam, I believe that our forefathers kept their stance, and I think they did the right thing.  I think they kept it out of the world, whether it was at Vienna, or Tours, or other places… It bequeathed to us the great institution that is the church of the West."  Bannon continued: "[T]hey were able to stave this off, and they were able to defeat it, and they were able to bequeath to us a church and a civilization that really is the flower of mankind, so I think it's incumbent on all of us to do what I call a gut check, to really think about what our role is in this battle that's before us."[10]

---

[7] http://time.com/4611229/donald-trump-berlin-attack/ [last accessed February 1, 2017].
[8] https://twitter.com/realDonaldTrump/status/826060143825666051 [last accessed on February 1, 2017].
[9] https://twitter.com/realDonaldTrump/status/826774668245946368 [last accessed on February 1, 2017].
[10] https://www.buzzfeed.com/lesterfeder/this-is-how-steve-bannon-sees-the-entire-world [last accessed February 1,

1144492.01

39.     In an interview on January 28, 2017, one of Defendant Trump's senior advisors, Rudolph Giuliani, left no doubt that the ban on entry from nationals of the Designated Countries was intended to carry out a ban on Muslims, and that the Executive Order was crafted to create a pretextual cover for a Muslim ban.  Mr. Giuliani stated:  "I'll tell you the whole history of it.  So, when he [Defendant Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together.  Show me the right way to do it legally.'"[11]

40.     On January 29, an anonymous "senior administration official" briefed a reporter from Breitbart.com on the intended purpose of the Executive Order: "The reality, though, is that the situation [of large Islamic populations] that exists today in parts of France, in parts of Germany, in Belgium, etcetera, is not a situation we want replicated inside the United States."[12]

41.     Defendant Trump and his agents have also made it clear that they intend to favor non-Muslims nationals of the Designated Countries over Muslim nationals of those countries.  In an interview with the Christian Broadcasting Network on January 27, 2017, Defendant Trump asserted that the United States had been discriminating against Christian refugees from Syria in favor of Muslims, claiming that "If you were a Muslim, you could come in. But if you were Christian, it was almost impossible."  He continued, "they were chopping off the heads of everybody but more so the Christians.  I thought it was very, very unfair.  So we are going to help them."[13]

42.     Consistent with Defendant Trump's expressed intent to favor Christians, Section 5(e) of the Executive Order authorizes the Secretaries of the Department of State and the

---

2017].
[11] http://wpo.st/xzuY2 [last accessed on February 1, 2017].
[12] http://www.breitbart.com/big-government/2017/01/30/trump-changes-immigration-favor-american-values/ (parenthetical in original) [last accessed on February 1, 2017].
[13] http://www.breitbart.com/national-security/2017/01/27/trump-will-give-persecuted-christians-priority-refugee-status/ [last accessed on February 1, 2017].

CLASS ACTION COMPLAINT FOR DEC. AND INJUNCTIVE RELIEF
1144492.01

Department of Homeland Security to admit individuals who are "member[s] of a religious minority" in their countries of nationality who are "facing religious persecution." This provision directly grants Christians and other religions preference over Muslim refugees.

**Facts About Plaintiff Hadil Al-Mowafak**

43.   Plaintiff Hadil Al-Mowafak is a Yemeni national who is currently in her freshman year at Stanford University in Palo Alto, California and hopes to earn her undergraduate degree in 2020. She possesses a valid F-1 multiple-entry student visa that was duly issued on July 29, 2016. She has continuously resided in the United States since September 17, 2016. Plaintiff Al-Mowafak currently plans to travel to Yemen in the summer of 2017 to visit her husband, who lives in Yemen. Because her husband does not have a United States visa, the only way that Plaintiff Al-Mowafak can see her husband is if she travels to Yemen to visit him.

44.   In addition to being unable to travel to see her husband, Plaintiff Al-Mowafak fears that if she is not permitted to re-enter the United States because of the Executive Order and its implementation, she will be prevented from continuing her undergraduate studies. She is also fearful about the effects of the Provisional Revocation Letter on her immigration status.

**Facts About Plaintiff Wasim Ghaleb**

45.   Plaintiff Wasim Ghaleb is a 23-year-old national of Yemen, who attends Grossmont College in San Diego, California. He is majoring in business administration. He hopes to complete his Associate degree at Grossmont College, transfer to a Bachelor of Arts program at a university, and complete his studies in 2020.

46.   On January 15, 2016, Ghaleb traveled to Saudi Arabia to spend time with family during a break in the academic schedule. As the holder of a valid, multiple-entry F-1 visa that

-12-

1144492.01

would allow him to re-enter at any time prior to February 23, 2017, Ghaleb intended to return on January 28, 2017, to begin the new semester on January 30.

47.     On January 28, Plaintiff Ghaleb went to the airport in Jeddah and boarded a British Airways flight to London with a reservation on a connecting flight to Los Angeles, California. When he arrived in London and went to the gate for his flight to Los Angeles International Airport ("LAX"), he heard his name being called over a loudspeaker.  When Plaintiff Ghaleb approached the counter, individuals he understood to be U.S. agents of Defendant DHS informed him that he could not continue on his flight to LAX because Defendant Trump had banned citizens from seven countries—including Yemen—from traveling to the United States.  Plaintiff Ghaleb showed the agents his Form I-20 and valid F-1 entry visa, to demonstrate that he had permission to enter the United States, but the agents told him he had no choice but to return to Jeddah.

48.     Based on instructions from the U.S. agent who informed Plaintiff Ghaleb of the travel ban, Plaintiff Ghaleb arranged for a return flight to Jeddah on British Airways.  He spent seven hours in the London airport wondering what his future would hold, worrying that he would not be able to complete the semester at Grossmont College, and making calls and asking questions to try to find a way to travel to the United States before returning to Jeddah.  Plaintiff Ghaleb has already missed several days of the new semester, but he is eager to return and intends to complete the semester if the U.S. will honor his duly issued F-1 visa and Form I-20.

**Facts About Plaintiff John Doe**

49.     Plaintiff John Doe is an Iranian national who is currently a Ph.D. candidate at University of California, Berkeley. Plaintiff Doe expects to receive his Ph.D. by May of 2017. He holds a 3.9 grade point average and has published scholarly articles in prestigious scientific

journals.  He possesses a valid F-1 student visa and has continuously resided in the United States since September 2012.  Plaintiff Doe currently lives in Albany, California.  He is completing his fifth and final year of study in engineering.

50.     In December 2016, before the Executive Order was issued, Plaintiff Doe applied for Optional Practical Training ("OPT").  OPT is post-graduation work authorization for international students.  After he applied for OPT, he received and accepted a job offer for a product development position at a top Fortune 50 Company in Silicon Valley.  He fears that his OPT will be affected.  If his OPT is affected by the Executive Order, then he will be unable to start his job on a timely basis and may be denied the job.  Plaintiff Doe is also fearful about the effects of the Provisional Revocation Letter on his immigration status.

51.     For the reasons set forth below, the Executive Order and Provisional Revocation Letter unlawfully deprive Plaintiffs of their rights under the United States Constitution and the Immigration and Nationality Act, and are ultra vires.

**Facts Common to all Members of the Plaintiff Class**

52.     Since the Executive Order was announced on January 27, 2017, its implementation by Defendants and their agents has been marked by chaos and confusion.

53.     For example, on at least several occasions, Defendants and their agents have unlawfully required persons seeking entry into the United States who otherwise possessed valid visas or lawful permanent residence status to "voluntarily" renounce their U.S. immigration status by signing documents such as U.S. Customs and Immigration Services Form I-407, which is entitled "Record of Abandonment of Lawful Permanent Resident Status," under the false

representation that, if they did not do so, they would be ineligible for entry into the United States for a period of at least five years.

54.     As a result, individual Plaintiffs and members of the Plaintiff Class reasonably fear that, in the event they attempt to enter or re-enter the United States, they will be denied permission to do so, notwithstanding their previously established lawful presence in the United States and the fact that they are otherwise admissible.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(b) (1) and (b) (2), on their own behalf and on behalf of all other persons who are nationals of Iran, Iraq, Libya, Somalia, Sudan, Syria or Yemen (the "Designated Countries") who currently are, or recently have been, lawfully present in California and who, but for the January 27, 2017 Executive Order and the Provisional Revocation Letter, would be able to travel to the United States or leave and return to the United States.  This includes the following subclasses:

(a) Nationals of the Designated Countries who resided in California and left the United States prior to issuance of the Executive Order and the Provisional Revocation Letter with the intent to return, and are currently abroad; and

(b) Nationals of the Designated Countries who reside in California and were lawfully present in the United States upon issuance of the Executive Order and the Provisional Revocation Letter, and wish to be able, in the future, to leave the United States temporarily and return to the United States.

56.     The Plaintiff Class is so numerous that joinder is impracticable.  According to the Annual Report of the Visa Office, in 2015, the last year for which data are available, the United

States issued approximately 85,000 immigrant and non-immigrant visas to nationals from the seven Designated Countries.[14]  On information and belief, a large number of such persons reside, or have recently resided, in California.

57.     The claims of the Plaintiff Class members share common issues of law, including but not limited to whether the Executive Order violates their associational, religious exercise and due process rights under the First and Fifth Amendments, the Religious Freedom Restoration Act, the Immigration and Nationality Act and the Administrative Procedure Act.

58.     The claims of the Plaintiff Class members share common issues of fact, including but not limited to whether the Executive Order is being or will be enforced so as to prevent them from entering the United States from abroad or from re-entering the United States should they choose to leave the United States briefly, even though they would otherwise be admissible.

59.     The claims or defenses of the named Plaintiffs are typical of the claims or defenses of members of the Plaintiff Class.

60.     The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff class.  The named Plaintiffs have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff class.   The attorneys representing the named Plaintiffs include experienced civil rights attorneys and are considered able practitioners in federal constitutional litigation.  These attorneys should be appointed as class counsel.

61.     Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate

---

[14]  https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2015AnnualReport/FY15AnnualReport-TableIII.pdf ;
https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2015AnnualReport/FY15AnnualReport-TableXVIII.pdf [last accessed on February 1, 2017].

CLASS ACTION COMPLAINT FOR DEC. AND INJUNCTIVE RELIEF

1144492.01

to the class as a whole.  The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b) (2).

62.     Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class.  The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b) (1).

## CLAIMS FOR RELIEF

### COUNT ONE
### FIRST AMENDMENT – ESTABLISHMENT, FREE EXERCISE, SPEECH AND ASSEMBLY CLAUSES

63.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

64.     The First Amendment prohibits the establishment of a religion or the prohibition of the free exercise of religion.

65.     The Executive Order and the Provisional Revocation Letter constitute an unlawful attempt to discriminate against Muslims and to establish a preference for one religion over another.  References in the Executive Order and the Provisional Revocation Letter to the seven Designated Countries are transparently a pretext for the underlying aim to establish this preference.

66.     Plaintiffs are harmed by this preference in that Defendants seek to disadvantage them, as compared to other religions, in the consideration and continuation of their status as lawfully entering, or being present in the United States.

67.     The Executive Order and the Provisional Revocation Letter also violate the rights of Plaintiffs ACLU-NC and Jewish Family & Community Services East Bay to receive

information and speech from, and to associate freely with, the individual Plaintiffs and Plaintiff class members.

## COUNT TWO
## RELIGIOUS FREEDOM RESTORATION ACT

68. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

69. The Executive Order and the Provisional Relocation Letter will have the effect of imposing a special disability on the basis of religious views or religious status, by withdrawing important immigration benefits principally from Muslims on account of their religion. In doing so, the Executive Order and the Provisional Revocation Letter place a substantial burden on Muslims' exercise of religion in a way that is not the least restrictive means of furthering a compelling governmental interest.

70. Defendants' actions therefore constitute a violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 *et seq.*

## COUNT THREE
## FIFTH AMENDMENT – EQUAL PROTECTION

71. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

72. The Executive Order and the Provisional Revocation Letter discriminate against Plaintiffs on the basis of their country of origin, and without sufficient justification, and therefore violate the equal protection component of the Due Process Clause of the Fifth Amendment.

73. Additionally, the Executive Order and the Provisional Revocation Letter were substantially motivated by animus toward—and have a disparate effect on—Muslims, which also violates the equal protection component of the Due Process Clause of the Fifth Amendment.

1144492.01

**COUNT FOUR**
**FIFTH AMENDMENT – PROCEDURAL DUE PROCESS**

74.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

75.     Procedural due process requires that the government be constrained before it acts in a way that deprives individuals of liberty interests protected under the Due Process Clause of the Fifth Amendment.

76.     The United States government is obligated by international law and by U.S. law, including but not limited to the INA, 8 U.S.C. §1101(a)(13)(C), to fairly process for entry or re-entry into the United States those persons who are lawful permanent residents, who have established a significant connection with the United States and continuously resided in the United States, or who have complied with all of the legal and procedural requirements for lawful entry into the United States.

77.     Defendants' actions, as described above, have denied Plaintiffs who are currently outside the United States the opportunity to re-enter the United States, and have denied Plaintiffs who currently lawfully reside in the United States, the opportunity to travel outside the United States, for fear that they will be denied re-entry.  Such actions, taken pursuant to the Executive Order, violate the procedural due process rights guaranteed by the Fifth Amendment.

**COUNT FIVE**
**IMMIGRATION AND NATIONALITY ACT**

78.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

79.     The INA forbids discrimination in issuance of visas based on a person's nationality, place of birth, or place of residence.  8 U.S.C. § 1152(a)(1)(A).

-19-

1144492.01

80.     Defendants' actions as set forth above were arbitrary, capricious, discriminatory, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

## COUNT SIX
## ADMINISTRATIVE PROCEDURE ACT

81.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

82.     The Administrative Procedure Act, 5 U. S. C. § 706 (2), places clear limits on the exercise of discretion to revoke a visa under 8 U.S.C. § 1201(i).  Specifically, the Secretary of State must comply with statutory procedures for the revocation of a visa; the Secretary's action must not exceed his or her statutory authority; and the Secretary must respect the constitutional rights enjoyed by visa holders.

83.     The Provisional Revocation Letter is facially improper because it was issued on a blanket basis, without considering information related to the eligibility of any individual alien. Under 22 C. F. R. § 41.122(b)(2) and 22 C. F. R. § 41.82(b), a visa can only be provisionally revoked on the basis of a particularized finding that a visa holder is ineligible.

84.     The Provisional Revocation Letter is also facially defective for lack of proper notice.  Under 22 C. F. R. § 41.122(c) and 22 C. F. R. § 41.82(c), notice of provisional revocation must be given to the visa holder where practicable, unless otherwise instructed by the Department of State.   There is no evidence of an instruction not to give notice, or that notice was not practicable.

85.     Defendants' actions as set forth above were arbitrary, capricious, discriminatory, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right,

1   power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or

2   short of statutory right; and without observance of procedure required by law, in violation of the

3   Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

4                                    **PRAYER FOR RELIEF**

5

6       **WHEREFORE**, Petitioner prays that this Court grant the following relief:

7       1.      A determination that this action may properly be maintained as a class action

8   pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(2);

9

10      2.      A declaration that the Executive Order and the Provisional Revocation Letter are

11  in violation of the rights of Plaintiffs and Plaintiff Class members for the reasons set forth above.

12

13      3.      An injunction that the Executive Order and the Provisional Revocation Letter may

14  not be enforced as against Plaintiffs and Plaintiff Class members in connection with their entry or

15  re-entry into the United States;

16

17      4.      An award to the Plaintiff Class of reasonable costs and attorney's fees; and,

18      5.      Such other and further relief that this Court may deem fit and proper.

19

20  Dated:  February 2, 2017                    AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION OF NORTHERN
21                                              CALIFORNIA, INC.

22

23

24                                              By: _s/Christine P. Sun_____
                                                     CHRISTINE P. SUN
25
                                                     Attorneys for Plaintiffs
26

27

28

CLASS ACTION COMPLAINT FOR DEC. AND INJUNCTIVE RELIEF
1144492.01

Dated:  February 2, 2017                KEKER & VAN NEST LLP


                                         By: _s/R. Adam Lauridsen_
                                              R. ADAM LAURIDSEN

                                         Attorneys for Plaintiffs

# EXHIBIT A

THE WHITE HOUSE

Office of the Press Secretary


For Immediate Release
January 27, 2017

EXECUTIVE ORDER

- - - - - - -

PROTECTING THE NATION FROM FOREIGN TERRORIST
ENTRY INTO THE UNITED STATES


By the authority vested in me as President by the
Constitution and laws of the United States of America, including
the Immigration and Nationality Act (INA), 8 U.S.C. 1101
*et seq.*, and section 301 of title 3, United States Code, and to
protect the American people from terrorist attacks by foreign
nationals admitted to the United States, it is hereby ordered as
follows:

Section 1.  Purpose.  The visa-issuance process plays a
crucial role in detecting individuals with terrorist ties and
stopping them from entering the United States.  Perhaps in no
instance was that more apparent than the terrorist attacks of
September 11, 2001, when State Department policy prevented
consular officers from properly scrutinizing the visa
applications of several of the 19 foreign nationals who went on
to murder nearly 3,000 Americans.  And while the visa-issuance
process was reviewed and amended after the September 11 attacks
to better detect would-be terrorists from receiving visas, these
measures did not stop attacks by foreign nationals who were
admitted to the United States.

Numerous foreign-born individuals have been convicted or
implicated in terrorism-related crimes since September 11, 2001,
including foreign nationals who entered the United States after
receiving visitor, student, or employment visas, or who entered
through the United States refugee resettlement program.
Deteriorating conditions in certain countries due to war,
strife, disaster, and civil unrest increase the likelihood that
terrorists will use any means possible to enter the United
States.  The United States must be vigilant during the visa-

issuance process to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism.

In order to protect Americans, the United States must ensure that those admitted to this country do not bear hostile attitudes toward it and its founding principles.  The United States cannot, and should not, admit those who do not support the Constitution, or those who would place violent ideologies over American law.  In addition, the United States should not admit those who engage in acts of bigotry or hatred (including "honor" killings, other forms of violence against women, or the persecution of those who practice religions different from their own) or those who would oppress Americans of any race, gender, or sexual orientation.

Sec. 2.  Policy.  It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks in the United States; and to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes.

Sec. 3.  Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern.  (a)  The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat.

(b)  The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed for adjudications and a list of countries that do not provide adequate information, within 30 days of the date of this order.  The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State and the Director of National Intelligence.

(c)  To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and

maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals, pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas).

(d)   Immediately upon receipt of the report described in subsection (b) of this section regarding the information needed for adjudications, the Secretary of State shall request all foreign governments that do not supply such information to start providing such information regarding their nationals within 60 days of notification.

(e)   After the 60-day period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit the entry of foreign nationals (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas) from countries that do not provide the information requested pursuant to subsection (d) of this section until compliance occurs.

(f)   At any point after submitting the list described in subsection (e) of this section, the Secretary of State or the Secretary of Homeland Security may submit to the President the names of any additional countries recommended for similar treatment.

(g)   Notwithstanding a suspension pursuant to subsection (c) of this section or pursuant to a Presidential proclamation described in subsection (e) of this section, the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked.

(h)   The Secretaries of State and Homeland Security shall submit to the President a joint report on the progress in implementing this order within 30 days of the date of this order, a second report within 60 days of the date of this order, a third report within 90 days of the date of this order, and a fourth report within 120 days of the date of this order.

Sec. 4.   Implementing Uniform Screening Standards for All Immigration Programs.   (a)   The Secretary of State, the Secretary of Homeland Security, the Director of National Intelligence, and the Director of the Federal Bureau of Investigation shall implement a program, as part of the adjudication process for immigration benefits, to identify individuals seeking to enter the United States on a fraudulent basis with the intent to cause harm, or who are at risk of causing harm subsequent to their admission. This program will include the development of a uniform screening standard and procedure, such as in-person interviews; a database of identity documents proffered by applicants to ensure that duplicate documents are not used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that the applicant is who the applicant claims to be; a process to evaluate the applicant's likelihood of becoming a positively contributing member of society and the applicant's ability to make contributions to the national interest; and a mechanism to assess whether or not the applicant has the intent to commit criminal or terrorist acts after entering the United States.

(b)   The Secretary of Homeland Security, in conjunction with the Secretary of State, the Director of National Intelligence, and the Director of the Federal Bureau of Investigation, shall submit to the President an initial report on the progress of this directive within 60 days of the date of this order, a second report within 100 days of the date of this order, and a third report within 200 days of the date of this order.

Sec. 5.   Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017.   (a)   The Secretary of State shall suspend the U.S. Refugee Admissions Program (USRAP) for 120 days.  During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, shall review the USRAP application and adjudication process to determine what additional procedures should be taken to ensure that those approved for refugee admission do not pose a threat

to the security and welfare of the United States, and shall
implement such additional procedures.  Refugee applicants who
are already in the USRAP process may be admitted upon the
initiation and completion of these revised procedures.  Upon the
date that is 120 days after the date of this order, the
Secretary of State shall resume USRAP admissions only for
nationals of countries for which the Secretary of State, the
Secretary of Homeland Security, and the Director of National
Intelligence have jointly determined that such additional
procedures are adequate to ensure the security and welfare of
the United States.

(b)  Upon the resumption of USRAP admissions, the Secretary
of State, in consultation with the Secretary of Homeland
Security, is further directed to make changes, to the extent
permitted by law, to prioritize refugee claims made by
individuals on the basis of religious-based persecution,
provided that the religion of the individual is a minority
religion in the individual's country of nationality.  Where
necessary and appropriate, the Secretaries of State and Homeland
Security shall recommend legislation to the President that would
assist with such prioritization.

(c)  Pursuant to section 212(f) of the INA, 8 U.S.C.
1182(f), I hereby proclaim that the entry of nationals of Syria
as refugees is detrimental to the interests of the United States
and thus suspend any such entry until such time as I have
determined that sufficient changes have been made to the USRAP
to ensure that admission of Syrian refugees is consistent with
the national interest.

(d)  Pursuant to section 212(f) of the INA, 8 U.S.C.
1182(f), I hereby proclaim that the entry of more than 50,000
refugees in fiscal year 2017 would be detrimental to the
interests of the United States, and thus suspend any such entry
until such time as I determine that additional admissions would
be in the national interest.

(e)  Notwithstanding the temporary suspension imposed
pursuant to subsection (a) of this section, the Secretaries of
State and Homeland Security may jointly determine to admit
individuals to the United States as refugees on a case-by-case
basis, in their discretion, but only so long as they determine
that the admission of such individuals as refugees is in the
national interest -- including when the person is a religious
minority in his country of nationality facing religious
persecution, when admitting the person would enable the United

States to conform its conduct to a preexisting international agreement, or when the person is already in transit and denying admission would cause undue hardship -- and it would not pose a risk to the security or welfare of the United States.

(f)  The Secretary of State shall submit to the President an initial report on the progress of the directive in subsection (b) of this section regarding prioritization of claims made by individuals on the basis of religious-based persecution within 100 days of the date of this order and shall submit a second report within 200 days of the date of this order.

(g)  It is the policy of the executive branch that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees.  To that end, the Secretary of Homeland Security shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement.

Sec. 6.  Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.  The Secretaries of State and Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority in section 212 of the INA, 8 U.S.C. 1182, relating to the terrorism grounds of inadmissibility, as well as any related implementing memoranda.

Sec. 7.  Expedited Completion of the Biometric Entry-Exit Tracking System.  (a)  The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for all travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b)  The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive contained in subsection (a) of this section.  The initial report shall be submitted within 100 days of the date of this order, a second report shall be submitted within 200 days of the date of this order, and a third report shall be submitted within 365 days of the date of this order.  Further, the Secretary shall submit a report every 180 days thereafter until the system is fully deployed and operational.

Sec. 8.  Visa Interview Security.  (a)  The Secretary of
State shall immediately suspend the Visa Interview Waiver
Program and ensure compliance with section 222 of the INA,
8 U.S.C. 1222, which requires that all individuals seeking a
nonimmigrant visa undergo an in-person interview, subject to
specific statutory exceptions.

(b)  To the extent permitted by law and subject to the
availability of appropriations, the Secretary of State shall
immediately expand the Consular Fellows Program, including by
substantially increasing the number of Fellows, lengthening or
making permanent the period of service, and making language
training at the Foreign Service Institute available to Fellows
for assignment to posts outside of their area of core linguistic
ability, to ensure that non-immigrant visa-interview wait times
are not unduly affected.

Sec. 9.  Visa Validity Reciprocity.  The Secretary of State
shall review all nonimmigrant visa reciprocity agreements to
ensure that they are, with respect to each visa classification,
truly reciprocal insofar as practicable with respect to validity
period and fees, as required by sections 221(c) and 281 of the
INA, 8 U.S.C. 1201(c) and 1351, and other treatment.  If a
country does not treat United States nationals seeking
nonimmigrant visas in a reciprocal manner, the Secretary of
State shall adjust the visa validity period, fee schedule, or
other treatment to match the treatment of United States
nationals by the foreign country, to the extent practicable.

Sec. 10.  Transparency and Data Collection.  (a)  To
be more transparent with the American people, and to more
effectively implement policies and practices that serve the
national interest, the Secretary of Homeland Security, in
consultation with the Attorney General, shall, consistent with
applicable law and national security, collect and make publicly
available within 180 days, and every 180 days thereafter:

(i)  information regarding the number of foreign
nationals in the United States who have been charged
with terrorism-related offenses while in the United
States; convicted of terrorism-related offenses while
in the United States; or removed from the United
States based on terrorism-related activity,
affiliation, or material support to a terrorism-
related organization, or any other national security

reasons since the date of this order or the last reporting period, whichever is later;

(ii)   information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States, since the date of this order or the last reporting period, whichever is later; and

(iii)   information regarding the number and types of acts of gender-based violence against women, including honor killings, in the United States by foreign nationals, since the date of this order or the last reporting period, whichever is later; and

(iv)   any other information relevant to public safety and security as determined by the Secretary of Homeland Security and the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

(b)   The Secretary of State shall, within one year of the date of this order, provide a report on the estimated long-term costs of the USRAP at the Federal, State, and local levels.

Sec. 11.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)   the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)   This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)   This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP


THE WHITE HOUSE,
     January 27, 2017.


# # #

# EXHIBIT B



**United States Department of State**

*Deputy Assistant Secretary*
*for Visa Services*

*Washington, D.C. 20520*

January 27, 2017

Upon request of the U.S. Department of Homeland Security and pursuant to sections 212(f) and 221(i) of the Immigration and Nationality Act and 22 CFR 41.122 and 42.82, and in implementation of section 3(c) of the Executive Order on Protecting the Nation from Terrorist Attacks by Foreign Nationals, I hereby provisionally revoke all valid nonimmigrant and immigrant visas of nationals of Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen, subject to the exceptions discussed below.

The revocation does not apply to visas in the following nonimmigrant classifications: A-1, A-2, G-1, G-2, G-3, G-4, NATO, C-2, or certain diplomatic visas.

The revocation also does not apply to any visa exempted on the basis of a determination made by the Secretaries of State and Homeland Security pursuant to section 3(g) of the Executive Order on a case-by-case basis, and when in the national interest.

This document is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Edward J. Ramotowski

Deputy Assistant Secretary

Bureau of Consular Affairs

Department of State